```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
REVISE CLOTHING, INC.,                :  09 Civ. 3961 (BSJ) (JCF)
                                      :
              Plaintiff,              :      MEMORANDUM
                                      :      AND  ORDER
     - against -                      :
                                      :
JOE'S JEANS SUBSIDIARY, INC.,         :
JOE'S JEANS, INC.,                    :
                                      :
              Defendants.             :
- - - - - - - - - - - - - - - - - - -:
JOE'S JEANS SUBSIDIARY, INC., and  :
JOE'S JEANS, INC.,                    :
                                      :
          Third-Party Plaintiffs,    :
                                      :
     - against -                      :
                                      :
TARGET CORPORATION and TARGET         :
BRANDS, INC.,                         :
                                      :
          Third-Party Defendants.   :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

A motion to disqualify counsel in this action presents two critical issues of professional responsibility. First, when does an attorney-client relationship terminate? Second, once the relationship has ended, under what circumstances may counsel take on representation adverse to the former client?

This is a trademark infringement case concerning back pocket stitching on denim jeans. Defendants and third-party plaintiffs Joe's Jeans Subsidiary, Inc. and Joe's Jeans, Inc. (collectively, "Joe's Jeans") contend that jeans manufactured by plaintiff Revise Clothing Inc. ("Revise") and sold at retail by third-party

1

defendants Target Corporation and Target Brands, Inc. (collectively, "Target") infringe Joe's Jeans' trademark back pocket design. Revise initiated this action, seeking a declaratory judgment that it has not infringed.

Revise now moves for an order disqualifying the law firm of Pryor Cashman LLP ("Pryor Cashman") as counsel for Joe's Jeans. According to Revise, Pryor Cashman has a conflict of interest because it currently represents Revise. Furthermore, Revise argues that even if that engagement has concluded, Pryor Cashman obtained confidential information during the course of that representation that now places Revise at a disadvantage if Pryor Cashman is allowed to continue to represent Joe's Jeans. While Pryor Cashman concedes that it previously represented Revise, it contends that the prior engagement has long since terminated. The firm also maintains that because the two matters are unrelated, any confidential information it received earlier from Revise could not be used to the detriment of Revise in the instant litigation.

Joe's Jeans has also moved to strike the affidavit of Mohammed Sadiqulla, the Chief Financial Officer of Revise, which Revise submitted in support of its disqualification motion. In the alternative, Joe's Jeans asks that the Court consider its surreply.

In addition to submitting affidavits and legal memoranda, the parties presented evidence at a hearing on November 20 and December 7, 2009.

2

For the reasons set forth below, Joe's Jeans' motion to strike Mr. Sadiqulla's affidavit is denied, but its alternative application that the Court consider its surreply is granted. The motion by Revise to disqualify Pryor Cashman as counsel for Joe's Jeans is denied.

<u>Background</u>

In October 2007, Gordon Troy, an attorney who had represented Revise in intellectual property matters, contacted Brad Rose, a partner at Pryor Cashman, requesting that Pryor Cashman represent Revise in connection with a dispute it was having with Jean City USA and Wet Jeans, Inc. (collectively, "Wet Jeans") (Declaration of Brad D. Rose dated Oct. 2, 2009 ("Rose Decl."), ¶ 3; Tr. at 148).[1]  Mr. Troy and Mr. Rose had met in 2003 and subsequently enjoyed a professional relationship. (Rose Decl., ¶ 2).  Mr. Troy advised Mr. Rose that Wet Jeans was selling jeans that bore a mark substantially similar to Revise's VANILLA STAR trademark. (Rose Decl., ¶ 3; Tr. at 148).  Although Mr. Troy had sent Wet Jeans a cease and desist letter, Wet Jeans continued its allegedly infringing activity. (Rose Decl., ¶ 3).

On November 7, 2007, Mr. Sadiqulla contacted Mr. Rose and asked to discuss the case.[2]  (Rose Decl., ¶ 4 & Exh. A).  The next

---

[1] "Tr." refers to the transcript of the evidentiary hearing.

[2] Both in documents and in testimony presented at the evidentiary hearing on the instant motion, Mr. Sadiqulla is often referred to as Mr. "Sadiq," an abbreviated form of his name.

day, Mr. Sadiqulla, together with the Chief Executive Officer of Revise, Sandeep Behl, met with Mr. Rose and Nicole Kaplan, another Pryor Cashman attorney.    (Rose Decl., ¶ 4).    Mr. Sadiqulla maintains that the meeting lasted two hours (Tr. at 113), while Mr. Rose and Ms. Kaplan contend that it took an hour or less, as reflected in Mr. Rose's time records.  (Tr. at 216-17;  Def. Exh. 4).[3]   More importantly, Mr. Sadiqulla asserts that he revealed a wide range of confidential information during the meeting:

> When we first met Nicole and Brad, basically they wanted to feel what the size of the company was, whether it was worth it for them to go forward, whether we had the capacity to -- to pay the legal bills.
>
> And once we went along we gave them all the information, basically our sources where we were selling, whether it was private label or branded business, and we had given them -- we thought of giving them the name of the stores we were doing business with that litigation was of no use, so we had to disclose who we were selling and who they were trying to sell -- they in the sense of Wet Jeans was trying to sell, and at what price points we were selling and what price points they were trying to sell.

(Tr. at 89).    According to Mr. Sadiqulla, he disclosed the customers to which Revise sells either its own brands or private label merchandise.  (Tr. at 90).  Further, he revealed the volume of sales, the overhead structure, and the profit margin for his business.  (Tr. at 91-92, 97).

Mr. Rose, by contrast, did not recall having any specific

---

[3] Unless otherwise indicated, the exhibits referred to were admitted at the evidentiary hearing.

conversation regarding Revise's finances (Tr. at 27-28), and he contends that the discussion focused entirely on the trademarks at issue. (Tr. at 29). Similarly, according to Ms. Kaplan,

> Revise came to the firm and explained about the problem they were having with Wet Jeans, Jeans City. They showed us the correspondence that had gone back and forth between Gordon [Troy] and counsel for Jeans City, or Wet Jeans. They showed us their trademark registration for the Vanilla Star brand trademark and they brought with them a green army jacket as a sample of the Vanilla Star merchandise.

(Tr. at 217-18). Ms. Kaplan asserted that the Revise representatives did not discuss any trademarks other than VANILLA STAR; they did not discuss the design of their jeans, the back pocket stitching, their private label work, their manufacturing process, sales to Target, or any of their customers. (Tr. at 218-19). Indeed, she explained that although Mr. Sadiqulla and Mr. Behl mentioned that they had received returns of Wet Jeans merchandise, they did not at that time identify the customers who had made the erroneous returns. (Tr. at 219).

Following that meeting, Mr. Rose prepared a retainer agreement that he forwarded to Revise. (Rose Decl., ¶ 6). The agreement provided that Pryor Cashman would represent Revise "in connection with the trademark infringement claims to be asserted against Wet Jeans, Inc." (Pl. Exh. 3 at 1). The agreement further stated that Pryor Cashman could terminate the attorney-client relationship if it did so "in a manner which complies with applicable law, court rules and the New York Code of Professional Responsibility." (Pl.

Exh. 3 at 2).

On November 14, 2007, Ms. Kaplan placed a telephone call to
Mr. Troy to discuss the Wet Jeans matter further.  (Tr. at 149,
219; Def. Exh. 4, entry for Nov. 14, 2007).  According to Mr. Troy,
he revealed extensive confidential information about Revise to Ms.
Kaplan during this conversation.  He characterized the discussion
as follows:

> We talked about the size of the company, that, you know,
> the -- that, you know -- you know, how many, you know,
> different seasons they have, what is the range of their
> products, who do they sell to -- I mean, real, you know,
> details about their business to understand who this
> client is, because even though they're in the jeans
> business doesn't mean they're the same as the next jean
> manufacturer.  They're all different.
>
>                          . . .
>
> Revise basically sells to -- as Mr. Sadiq explained,
> they -- that is -- they sell to Federated Department
> Stores.  They sell to these big, massive chains, whether
> it be, you know, Target, Walmart, Federated.  There's --
> I don't know, there's this -- Kohl's, I think, is the
> name of one.  There's another -- there's a big one in the
> south that is a major customer of Revise -- and explained
> the distribution of these products.
>
> We talked about the fact they they've got an office
> in California.  The reason why they have an office for --
> in California is that all their -- you know, their
> product at that point was being manufactured in the
> Orient, whether it be China, Vietnam, India, and it was
> being shipped into L.A. because it's more efficient to
> ship to L.A. and then distribute from L.A.  I mean, we
> talked about all the infrastructure business aspects of
> how Revise worked.

(Tr. at 174-76).  Ms. Kaplan, by contrast, insists that the
conversation related exclusively to Wet Jeans and to the history of

the communications between Mr. Troy and Wet Jeans' counsel.  (Tr. at 219-20).  She denies discussing any of the topics that Mr. Troy testified to, including Revise's distribution networks, its office locations, or the details of its infrastructure.  (Tr. at 220-21). Following the telephone conversation, Mr. Troy sent Ms. Kaplan an e-mail, attaching the relevant Wet Jeans correspondence and identifying the attorneys with whom he had communicated about the matter.  (Pl. Exh. 7).

Pryor Cashman prepared a complaint against Wet Jeans and filed it in late November 2007.  (Rose Decl., ¶¶ 8-9).  However, it did not serve the complaint at that time, and instead mailed a copy to Wet Jeans' counsel along with a cease and desist letter.  (Rose Decl., ¶ 9).  By December, the parties were in negotiations, and the case was resolved with a settlement agreement executed in May 2008.  (Rose Decl., ¶¶ 10, 12).  Pursuant to that agreement, Wet Jeans agreed to certify the date on which it had sold off all allegedly infringing merchandise, and it further agreed not to sell apparel with any mark similar to Revise's VANILLA STAR trademark. (Pl. Exh. 5, ¶¶ 1, 2).  The agreement further provided for notice and an opportunity to cure in the event that either side breached any of the terms.  (Pl. Exh. 5, ¶ 9).  Where notice to Revise was required under the agreement, it was to be delivered to Mr. Rose at Pryor Cashman.  (Pl. Exh. 5, ¶ 12).

At the same time that Pryor Cashman was involved in the Wet

7

Jeans litigation, it also performed limited trademark investigations -- known as "knockout searches" -- on behalf of Revise. Revise was interested in marketing apparel with the slogans "Smart Girls Rock" and "Live the Dream," and asked Pryor Cashman to determine whether these terms were already subject to trademark protection. (Tr. at 223). Accordingly, in December 2008, counsel performed computerized searches of trademark office databases using different permutations of the requested terms. (Tr. at 47-49, 222-23). For these services, Pryor Cashman billed for 1.5 hours of Ms. Kaplan's time and 0.25 hours of Mr. Rose's time. (Tr. at 222-23; Def. Exh. 4, entries for 12/12/07).

After the Wet Jeans litigation concluded, Pryor Cashman archived its files related to the matter. (Rose Decl., ¶ 13). However, the firm continued to send Revise e-mail "blasts" offering services related to trademark law. (Tr. at 51, 98-99).

In the spring of 2009, Joe's Jeans discovered that Target was selling jeans under the "Xhileration" label that contained stitching on the back pocket in the form of an inverted arc. (Complaint, Exh. 2). Joe's Jeans believed that this infringed its registered trademark for back pocket stitching, and its counsel at that time, Jordan A. LaVine of the Philadelphia firm of Flaster Greenberg, therefore sent a cease and desist letter to Target on March 5, 2009. (Complaint, Exh. 2). Target forwarded this letter to its supplier, Revise, and on March 20, 2009, Mr. Troy replied on

behalf of Revise, disputing the assertions made by Joe's Jeans. (Complaint, Exh. 3). When the parties were unable to resolve their differences, Revise filed the instant action against Joe's Jeans on April 21, 2009.

Also in April, Joe's Jeans engaged Pryor Cashman as its counsel. (Tr. at 6). Aware that the firm had previously represented Revise, Mr. Rose contacted Ms. Kaplan and confirmed that the earlier matter had been completed. (Tr. at 8). On May 11, Mr. Rose contacted Mr. Troy in an effort to resolve the dispute between Joe's Jeans and Revise. (Tr. at 14-15). According to Mr. Troy, Mr. Rose volunteered that because of Pryor Cashman's representation of Revise, he would not represent Joe's Jeans further if the parties were unable to reach an accommodation. (Tr. at 161-62). Mr. Rose denies making any such statement. (Tr. at 16). The next day, Mr. Troy sent a follow-up e-mail addressing a number of issues that the two had discussed and stating that "[m]y client consents to allow you to represent Joe's Jeans for the limited purposes of settlement." (E-mail of Gordon E.R. Troy dated May 12, 2009, attached to Pl. Exh. 1). When a quick resolution was not achieved and Pryor Cashman continued to represent Joe's Jeans as the litigation moved forward, Revise filed the instant disqualification motion.

Initially, Revise supported its motion with a declaration executed by Mr. Troy. (Declaration of Gordon E.R. Troy dated Sept.

15, 2009).  Joe's Jeans responded in part by challenging Mr. Troy's declaration as conclusory and inadmissible, as it appeared to be based on information beyond his personal knowledge.  (Memorandum of Law in Opposition to Motion of Revise Clothing, Inc. to Disqualify Counsel at 2, 17-18).   Revise then proffered Mr. Sadiqulla's affidavit as part of its reply papers.  Joe's Jeans, in turn, moved to strike that affidavit or, in the alternative, for consideration of its surreply.

Discussion

    A. Motion to Strike

    A court has discretion to consider documents filed in violation of procedural rules.  See Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005); Coyle v. Crown Enterprises, Inc., No. 05-CV-891F, 2009 WL 763401, at *8 (W.D.N.Y. March 19, 2009); Aurora Loan Services, Inc. v. Posner, Posner & Associates, P.C., 513 F. Supp. 2d 18, 20 (S.D.N.Y. 2007).  It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden.  See Tolliver v. McCants, No. 05 Civ. 10840, 2009 WL 1473445, at *3 (S.D.N.Y. May 26, 2009); Aurora Loan Services, 513 F. Supp. 2d at 20; Seneca Insurance Co. v. Wilcock, No. 01 Civ. 7620, 2005 WL 2898460, at *8 (S.D.N.Y. Nov. 3, 2005).  Nevertheless, Joe's Jeans has suffered no prejudice because it has submitted a surreply and also had the

opportunity to present evidence at the evidentiary hearing. Therefore, I will consider Joe's Jeans' surreply and will not strike Mr. Sadiqulla's affidavit.  See <u>Toure v. Central Parking Systems of New York</u>, No. 05 Civ. 5237, 2007 WL 2872455, at *2 (S.D.N.Y. Sept. 28, 2007) (allowing new argument in reply where non-moving party submitted surreply); <u>Lee v. Coughlin</u>, 26 F. Supp. 2d 615, 617 n.2 (S.D.N.Y. 1998).

   B. <u>Disqualification Motion</u>

      1. <u>General Principles</u>

   In considering a motion to disqualify counsel, a court must "balance 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'" <u>Hempstead Video, Inc. v. Incorporated Village of Valley Stream</u>, 409 F.3d 127, 132 (2d Cir. 2005) (quoting <u>Government of India v. Cook Industries, Inc.</u>, 569 F.2d 737, 739 (2d Cir. 1978)).  Thus, although any doubt should be resolved in favor of disqualification, <u>Hull v. Celanese Corp.</u>, 513 F.2d 568, 571 (2d Cir. 1975); <u>Merck Eprova AG v. ProThera, Inc.</u>, __ F. Supp. 2d __, __, No. 08 Civ. 0035, 2009 WL 4067209, at *5 (S.D.N.Y. Sept. 17, 2009); <u>Bowens v. Atlantic Maintenance Corp.</u>, 546 F. Supp. 2d 55, 86 (E.D.N.Y. 2008); <u>Blue Planet Software, Inc. v. Games International, LLC</u>, 331 F. Supp. 2d 273, 275 (S.D.N.Y. 2004), motions to disqualify counsel are disfavored and subject to a high standard of proof, in part because they can be used tactically as leverage in litigation.  <u>See</u>

11

Evans v. Artek Systems Corp., 715 F.2d 788, 791-92 (2d Cir. 1983) (noting "high standard of proof" for disqualification motions because they are "often interposed for tactical reasons"); see also Merck, __ F. Supp 2d at __, 2009 WL 4067209, at *5; Leslie Dick Worldwide, Ltd. v. Soros, No. 08 Civ. 7900, 2009 WL 2190207, at *6 (S.D.N.Y. July 22, 2009); Medical Diagnostic Imaging, PLLC v. CareCore National, LLC, 542 F. Supp. 2d 296, 306-07 (S.D.N.Y. 2008); Scantek Medical, Inc. v. Sabella, __ F. Supp. 2d __, __, No. 08 Civ. 453, 2008 WL 5210562, at *2 (S.D.N.Y. Dec. 12, 2008). Indeed, any motion to disqualify can cause delay, added expense, and interference with the attorney-client relationship. Scantek Medical, __ F. Supp. 2d at __, 2008 WL 5210562, at *2; Ello v. Singh, No. 05 Civ. 9625, 2006 WL 2270871, at *2 (S.D.N.Y. Aug. 7, 2006) (citing cases).

In deciding disqualification motions, courts look to the American Bar Association Model Rules of Professional Conduct and to state disciplinary rules including, in this forum, the New York Rules of Professional Conduct. Leslie Dick Worldwide, 2009 WL 2190207, at *5 & n.14. However, because the authority to disqualify an attorney is a function of the court's inherent supervisory power, see Hempstead Video, 409 F.3d at 132; Merck, 2009 WL 4067209, at *5; Medical Diagnostic Imaging, 542 F. Supp. 2d at 305; Skidmore v. Warburg Dillon Read LLC, No. 99 Civ. 10525, 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001), these rules provide

guidance only and are not conclusive. See Hempstead Video, 409 F.3d at 132; Merck, __ F. Supp. __, 2009 WL 4067209, at *5; Medical Diagnostic Imaging, 542 F. Supp. 2d at 305-06; Blue Planet Software, 331 F. Supp. 2d at 275; Skidmore, 2001 WL 504876, at *2. Thus, disqualification may be justified even in the absence of a clear ethical breach "where necessary to preserve the integrity of the adversary process. . . ." Board of Education of the City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979). But, by the same token, "not every violation of a disciplinary rule will necessarily lead to disqualification." Hempstead Video, 409 F.3d at 132. Indeed, "[m]ere appearance of impropriety will not alone serve as a sufficient basis for granting a disqualification motion. Rather, the motion will be granted only if the facts present a real risk that the trial will be tainted." United States Football League v. National Football League, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (footnote omitted); accord Hickman v. Burlington Bio-Medical Corp., 371 F. Supp. 2d 225, 229 (E.D.N.Y. 2005); Guerrilla Girls, Inc. v. Kaz, No. 03 Civ. 4619, 2004 WL 2238510, at *2 (S.D.N.Y. Oct. 4, 2004).

"The standard for disqualification varies depending on whether the representation is concurrent or successive." Hempstead Video, 409 F.3d at 133. It is "'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." Id. (quoting Cinema 5, Ltd. v.

13

Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir. 1976)).  In such cases, a "per se" standard applies and the attorney must be disqualified unless he can demonstrate "'at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation.'" Id. (quoting Cinema 5, 528 F.2d at 1387).   This standard is based on the ethical principle that an attorney must exercise independent judgment on behalf of a client.  This obligation is embodied in Rule 1.7 of the New York Rules of Professional Conduct, which states in pertinent part that

> a lawyer shall not represent a client if a reasonable lawyer would conclude that either:
>
>     (1) the representation will involve the lawyer in representing differing interests; or
>
>     (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

Rule 1.7(a).

A different standard applies where an attorney is in a position adverse to a former client.  In a case of successive representation, an attorney may be disqualified where:

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had

14

> access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

<u>Hempstead Video</u>, 409 F.3d at 133 (citing <u>Evans</u>, 715 F.2d at 791); <u>see also</u> <u>Blue Planet Software</u>, 331 F. Supp. 2d at 275-76. This standard is grounded in the ethical requirement that an attorney protect client confidences. This duty is articulated in Rule 1.6, which states in part that "[a] lawyer shall not knowingly reveal confidential information . . . or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person[.]" Rule 1.6(a).

### 2. <u>Termination of the Attorney-Client Relationship</u>

Revise argues that the standard for concurrent representation governs the pending motion because, at the time that Pryor Cashman was engaged by Joe's Jeans in this case, it was still representing Revise. Revise offers three theories as support for this contention. First, it maintains that it reasonably expected Pryor Cashman to provide all litigation-related services going forward. (Tr. at 98, 117, 254-55). Second, Revise argues that Pryor Cashman continued to be responsible for representing it in the Wet Jeans matter in particular. (Pl. Reply at 6; Troy Decl., ¶¶ 5-6; Tr. at 255-57; Affidavit of Mohammed Sadiqulla dated Oct. 9, 2009 ("Sadiqulla Aff."), ¶ 13). And, third, it contends that Pryor Cashman failed to explicitly sever the attorney-client relationship. (Pl. Reply at 6; Troy Decl., ¶ 6; Tr. at 254). None

of these theories withstands scrutiny.

a. <u>Scope of the Engagement</u>

When an attorney-client relationship ends depends largely on the purpose for which it was created:

> In what is perhaps the most typical situation, an attorney-client relationship created between a lawyer and a lay party is terminated, simply enough, by the accomplishment of the purpose for which it was formed in the first place. This rule is really a corollary of the principles that an attorney-client relationship arises only as to the particular matter or transaction on which the lawyer has expressly or implicitly bound himself to work, and that, unless the lawyer is on a general retainer covering the entire period involved, the relationship does not extend to business or affairs of the lay party as to which the lawyer was not initially contracted.

48 Am. Jur. Proof of Facts 2d § 18 (footnotes omitted). Thus, the first step here is to ascertain the nature of the retainer that created the relationship between Revise and Pryor Cashman. "General retainers are used to secure the services of a specific attorney for any contingency that may arise in the future. A special retainer has reference to a particular case or service[.]" Richard A. Lord, 23 Williston on Contracts § 62:2 (4th ed.) (footnotes omitted).

Revise argues that the Pryor Cashman retainer in this case "extended to the representation beyond the Wet Jeans case." (Tr. at 254). If, by this, Revise means to suggest that the language of the retainer contemplated work on other matters, Revise is mistaken. The retainer specifically refers to Pryor Cashman's

16

representation of Revise "in connection with the trademark infringement claims to be asserted against Wet Jeans, Inc." (Pl. Exh. 3 at 1). There is certainly no language implying that Pryor Cashman was to perform any other particular services for Revise or that it was to serve as counsel in unspecified matters that might arise in the future.

The limited nature of Pryor Cashman's engagement is consistent with the origin of the relationship. Mr. Troy was Revise's long-time counsel. Rather than handling the Wet Jeans matter himself, he referred it to Pryor Cashman because, as he testified, "at that particular junction, I was involved in another piece of litigation where -- with co-counsel that I just did not have the time to deal with the immediacy of the situation . . . ." (Tr. at 145). Mr. Troy's explanation conforms with Mr. Sadiqulla's understanding, at least as expressed in his affidavit, that "Mr. Troy did not have the time to represent Revise in an infringement case that needed to be filed right away." (Sadiqulla Aff., ¶ 2). In other words, Pryor Cashman's representation of Revise in the Wet Jeans case was expected to be a one-time arrangement, and Mr. Troy would continue to represent Revise in the future.

Nevertheless, Mr. Sadiqulla now asserts that he expected Pryor Cashman to represent Revise in all future litigation matters. (Tr. at 117). Any such expectation would have been wholly unreasonable. The retainer was narrowly drawn to refer only to the Wet Jeans

matter.  Had Mr. Sadiqulla expressed any desire to have Pryor Cashman represent Revise in future litigation, Mr. Rose would surely have acted in Pryor Cashman's interest by drafting a more comprehensive agreement.

Nor does Pryor Cashman's transmission of e-mail blasts indicate that the firm continued to represent Revise.  In Applied Technology Ltd. v. Watermaster of America, Inc., No. 07 Civ. 6620, 2009 WL 804127 (S.D.N.Y. March 26, 2009), a party seeking disqualification argued that its receipt of a law firm newsletter demonstrated that it was a current client of the firm.  Id. at *6. The court rejected this contention, stating that "a mass-mailed newsletter, which may also have been sent to former or prospective clients as a way to generate business, does not support such a conclusion."  Id.  The same rationale applies here.

Finally, Mr. Sadiqulla's suggestion that Pryor Cashman would represent Revise in future litigation matters is belied by his own conduct.  When Revise was first threatened with litigation by Joe's Jeans, Mr. Sadiqulla sought assistance from mr. Troy, not from Pryor Cashman, even though it was not until later that Pryor Cashman began representing Joe's Jeans.  (Tr. at 117-18).

To be sure, Pryor Cashman did some work for Revise that was not related to the Wet Jeans litigation: it conducted preliminary trademark searches for two slogans that Revise was considering using.  However, this work consumed all of one and three-quarters

hours of attorney time.  Such de minimis legal work, performed as a courtesy for an existing client, is not sufficient to transform a limited engagement into a general retainer.

### b. Termination of the Wet Jeans Matter

Of course, the fact that the retainer is a narrow one is of little significance if the very matter for which Pryor Cashman was retained by Revise was still ongoing when the firm began to represent Joe's Jeans.  Revise contends that this was in fact the case here because, even after a settlement was reached in the Wet Jeans matter, there remained the possibility that Wet Jeans would breach the agreement, necessitating further litigation. (Pl. Reply at 6).

Counsel may have an ongoing attorney-client relationship with a party even after litigation has concluded when, for example, the resolution of a lawsuit obligates the parties to perform acts in the future.  See Irwin v. Mascott, 196 Fed. Appx. 455 (9th Cir. 2006) (denying motion my counsel to withdraw where client subject to injunction and contempt).  But there was no such obligation here.  While Wet Jeans was required by the settlement agreement to sell off its inventory of allegedly infringing product, it had already done so (Tr. at 225), and it provided an affidavit attesting to its compliance. (Pl. Exh. 5, ¶ 2; Tr. at 233).  Of course, Wet Jeans also had a continuing duty not to infringe.  But the inclusion of a prohibitory injunction in a judgment or a

settlement agreement does not give rise to an attorney-client relationship that continues in perpetuity.

Nor does the analysis change merely because the settlement agreement in this case identified Pryor Cashman as the entity to be notified in the event of a default. Just as the fact that an attorney is counsel for a party does not make that attorney the party's agent for service of process, see United States v. Ziegler Bolt and Parts Co., 111 F.3d 878, 881 (Fed. Cir. 1997); Kruska v. Perverted Justice Foundation, Inc., No. CV-08-0054, 2009 WL 4041941, at *2 (D. Ariz. Nov. 16, 2009), so too, the fact that an attorney agrees to act as agent for service of process does not create an attorney-client relationship or extend one that has otherwise terminated. When parties, for matters of convenience, designate counsel as their agents for service, they have not bestowed on counsel the panoply of duties and obligations that arise in a full attorney-client relationship.

### c. The Need for Formal Termination

Finally, Revise argues that its attorney-client relationship with Pryor Cashman persisted because Pryor Cashman never formally terminated it. Revise, however, has identified no rule of professional responsibility that requires a law firm to announce the conclusion of its engagement. Indeed, any such requirement would conflict with the principle cited above that the relationship is terminated upon the accomplishment of the purpose for which it

was created.

Nevertheless, Revise maintains that the retainer agreement in this case imposed a special duty on Pryor Cashman to memorialize the conclusion of the attorney-client relationship. Revise relies on the provision in the retainer that states:

> The attorney-client relationship is one of mutual trust and confidence, and you are, of course, free to terminate our relationship at any time. We will also be free to terminate the relationship at any time, and should that unlikely event occur, we will do so in a manner which complies with applicable law, court rules, and the New York Code of Professional Responsibility.

(Pl. Exh. 3 at 2, ¶ 4). But this language adds nothing to the analysis. First, this provision appears to refer to the means by which counsel may withdraw during the course of an ongoing matter which may, for example, require leave of court. As such, it is irrelevant to the issue of when a matter is concluded. Second, even if it did relate to termination of the attorney-client relationship at the completion of an engagement, this provision simply requires compliance with "applicable law, court rules, and the New York Code of Professional Responsibility," none of which obligate counsel to send its client a letter announcing the termination.

Pryor Cashman unquestionably represented Revise. However, that representation -- for the specific purpose of handling the Wet Jeans litigation -- ended by the time that the firm began to represent Joe's Jeans. Therefore, the conflict standards for

successive representation rather than those for concurrent representation apply to the instant disqualification motion.

### 3. Successive Representation

As discussed above, a conflict may lead to disqualification where: (1) counsel for the adverse party previously represented the moving party, (2) the subject matter of the prior representation is substantially related to the present lawsuit, and (3) counsel had, or was likely to have had, access to relevant confidential information during the course of the prior representation. Hempstead Video, 409 F.3d at 133; Evans, 715 F.2d at 791. In this case, there is no dispute that the first requirement has been met because Pryor Cashman previously represented Revise. It is hotly contested, however, whether the second and third criteria have been satisfied.

### a. Substantial Relationship

The second prong is established "only upon a showing that the relationship between issues in the prior and present cases is 'patently clear.' Put more specifically, disqualification has been granted or approved recently only when the issues involved have been 'identical' or 'essentially the same.' Government of India, 569 F.2d at 739-40 (citations and footnote omitted); accord Leslie Dick Worldwide, 2009 WL 2190207, at *9; Bennett Silvershein Associates v. Furman, 776 F. Supp. 800, 803 (S.D.N.Y. 1991). "It is the congruence of factual matters, rather than areas of law,

that establishes a substantial relationship between representations for disqualification purposes." United States Football League, 605 F. Supp. at 1460 n.26; accord Leslie Dick Worldwide, 2009 WL 2190207, at *9; Blue Planet Software, 331 F. Supp. 2d at 277; Mitchell v. Metropolitan Life Insurance Co., No. 01 Civ. 2112, 2002 WL 441194, at *8 (S.D.N.Y. March 21, 2002) ("[T]he relevant inquiry is not limited to whether there are common legal claims or theories . . ., but extends to whether there are common factual issues that are material to the adjudication of the prior and current representations."). Accordingly, "[t]his standard is easily applied to cases where both the prior and present representation involve litigation: 'if the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same, then there is a "substantial relationship" between the representations for purposes of a disqualification motion.'" Guerrilla Girls, 2004 WL 2238510, at *3 (quoting United States Football League, 605 F. Supp. at 1459).

   Once it is established that a substantial relationship exists between the prior and current matters, it is presumed that counsel who participated in both had access during the first litigation to confidential information that would be relevant in the second. This presumption, however, is rebuttable. See Government of India, 569 F.2d at 741 (Mansfield, J., concurring); Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 753-54 (2d

Cir. 1975); <u>Leslie Dick Worldwide</u>, 2009 WL 2190207, at *12 (collecting cases); <u>Wieme v. Eastman Kodak Co.</u>, No. 02-CV-6021, 2004 WL 2271402, at *2 (W.D.N.Y. Sept. 7, 2004).

Here, there is no substantial relationship between the Wet Jeans litigation and the current case.  Although both matters concern apparel that may be subject to trademark protection, the similarity ends there.  The Wet Jeans case dealt with the use of a mark that was allegedly deceptively similar to Revise's VANILLA STAR principal register trademark.  That mark, which consists exclusively of words, was issued to Revise for use in a wide variety of clothing, including shirts, pants, jackets, and jeans. (Trademark Reg. No. 2,762,901, attached as Exh. A to Complaint in <u>Revise Clothing, Inc. v. Wet Jeans</u>, attached as Exh. B to Rose Decl.).  Indeed, the sample that Revise provided to Pryor Cashman in connection with the Wet Jeans case was a jacket, not a pair of jeans.  This case, by contrast, concerns a supplemental register trademark for the design for back pocket stitching on jeans, pants, and denims.  (Trademark Reg. No. 3,506,808, attached as Exh. 1 to Complaint).  The prior case had nothing to do with stitching design, while the current case has nothing to do with any mark consisting of words.

Revise makes much of the argument that the line of clothing that was ultimately sold under Target's Xhileration private label originated as a Vanilla Star design.  In his affidavit, Mr.

Sadiqulla stated that "[t]he product over which Joe's Jeans has sued Revise is essentially the VANILLA STAR product line that we sued Wet Jeans over, and the only difference is that Revise has privately labeled it for Target." (Sadiqulla Aff., ¶ 9). Subsequently, he explained that after the VANILLA STAR jeans had been sold in Target stores, Target expressed interest in buying a similar line from Revise for sale under a private label. (Tr. at 93-94). However, Mr. Sadiqulla admitted that, on one hand, the Xhileration jeans never display a VANILLA STAR mark and, on the other hand, the VANILLA STAR jeans do not have back pocket stitching similar to the Xhileration design. (Tr. at 121-23). Thus, even if the Xhileration jeans at issue in this litigation evolved in some way from the VANILLA STAR line, the elements that are critical to the legal issues in this case are distinct from those that were important in the Wet Jeans case.

Nonetheless, Revise contends that in the course of representation in the Wet Jeans matter, Pryor Cashman had access to its strategic thinking. (Tr. at 262; Letter of Gordon E.R. Troy dated Aug. 12, 2009 ("Troy 8/12/09 Letter"), attached as Tab 4 to Troy Decl., at 3). However, "[w]here the only allegation of similarity is the attorney's alleged insight into the former client's general litigation thinking, similarity is not established." Scantek, ___ F. Supp. 2d at ___, 2008 WL 5210562, at *3 (citations and quotation marks omitted); accord Hickman, 371 F.

Supp. 2d at 230; <u>Matthews v. LeBoeuf, Lamb, Greene & MacRae</u>, 902 F. Supp. 26, 31 (S.D.N.Y. 1995). Indeed, "if insight into a former client's general 'litigation thinking' were to constitute 'relevant privileged information,' then disqualification would be mandated in virtually every instance of successive representation." <u>Vestron, Inc. v. National Geographic Society</u>, 750 F. Supp. 586, 595 (S.D.N.Y. 1990).

Revise also argues that Pryor Cashman was necessarily privy to its general business and marketing strategies and infrastructure. (Tr. at 89, 175-76, 261-63; Troy 8/12/09 Letter at 3). "Where an attorney's representation of a client is general in nature, he may be disqualified from representing an adverse party in later litigation, but only if the later litigation puts at issue the client's entire background." <u>Scantek</u>, ___ F. Supp. 2d at ___, 2008 WL 5210562, at *3 (citations omitted). That was not the case here for two reasons. First, Pryor Cashman's representation of Revise was not "general in nature;" it was limited to the Wet Jeans case and to two minimal trademark searches. Second, the current litigation, which involves only allegations of infringement of one design element on denim jeans, does not place in issue Revise's "entire background." Thus, background information that a diligent lawyer might obtain about the client upon accepting an engagement does not disqualify that lawyer from subsequently representing an adverse party unless that information is central to the claims in

26

the later matter.  Compare Applied Technology, 2009 WL 804127, at *7 (facts regarding former client's business structure not "necessary" to counterclaims in later litigation) with United States Football League, 605 F. Supp. at 1460 ("attorney's knowledge of the business plans, economic organization, prospective market position and other such background information" found relevant to subsequent antitrust litigation where moving party's market behavior was an essential issue).  Here, information about Revise's business infrastructure is extraneous to the narrow trademark claims in this lawsuit.

Revise places great reliance on Miroglio, S.p.A. v. Morgan Fabrics Corp., 340 F. Supp. 2d 510 (S.D.N.Y. 2004), a case in which counsel who had represented one party in three prior copyright matters was disqualified from representing an adverse party in a subsequent action alleging infringement of a design for fabric. Id. at 511.  There, however, counsel learned very specific information about the first client that could have been used against it in the later case:

> The three copyright issues on which [the lawyer] recently represented [the former client] related specifically to fabric designs. . . .  In order to competently represent [the former client] on these issues, a reasonable attorney would be expected to acquire a minimum base of knowledge about how [the former client] goes about creating designs.  The degree of originality required before a fabric design becomes copyrightable and the extent of copying of a fabric design that constitutes infringement were questions within the scope of the prior representation and are issues that are likely to arise in this litigation.

Id. at 513.  In Miroglio, then, the prior and current representations were closely related because both involved copyrights for fabric design.  That is a far cry from this case, where the previous litigation concerned a trademark name that Revise owns and the current litigation involves Joe's Jeans' trademark for a stitching design.

Revise, therefore, has failed to demonstrate that Pryor Cashman's prior representation of it is substantially related to the instant case.  Consequently, there is no presumption that the firm obtained relevant confidential information in the course of the earlier litigation.

### b.  Access to Confidential Information

The presumption is a substitute for proof: it "arises in order to forestall a direct inquiry into whether confidential information was in fact transmitted by the client."  United States Football League, 605 F. Supp. at 1461.  Accordingly,

> in order to grant a disqualification motion, a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case.  Such a requirement would put the former client to the Hobson's choice of either having to disclose the privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.

Government of India, 569 F.2d at 740 (citations omitted).[4]

---

[4] The danger identified by the court in Government of India may be more theoretical than real.  The moving party, after all, necessarily alleges that conflicted counsel has already obtained

However, a moving party that is unable to demonstrate a substantial relationship between prior and current matters should not be foreclosed from showing that its former attorney actually received confidential information that may now be used against it. <u>See</u> <u>Hickman</u>, 371 F. Supp. 2d at 231 ("The failure to prove a substantial relationship between the earlier and present litigation destroys any presumption of relevant shared confidences and Defendants' papers point to no particular instance of any such confidence."); <u>Matthews</u>, 902 F. Supp. at 31 (noting invitation to moving party to submit affidavits specifying confidential information allegedly disclosed).    Revise was given such an opportunity here.    Moreover, the transcript of the evidentiary hearing was filed under seal so that the parties "could reveal to me <u>in camera</u> the full scope of the attorney-client relationship between" Pryor Cashman and Revise.  <u>United States Football League</u>, 605 F. Supp. at 1462 (utilizing confidentiality order and sealing to permit disclosure of communications to rebut inference that confidential information was revealed in prior representation).

I am not persuaded that Revise actually disclosed relevant confidential information to Pryor Cashman.  Revise maintains that Pryor Cashman has implicitly admitted that it received privileged

---

the confidential information.  Thus, disclosure through the disqualification motion will not reveal to counsel more than it already knows, and steps such as sealing the motion can prevent the information from being disseminated further.

information because it redacted certain documents from the prior representation before submitting them in connection with the instant motion. (Tr. at 40-45, 94-95; Pl. Exh. 2). But this proves nothing. It goes without saying that Pryor Cashman exchanged privileged communications with Revise during the time that it represented Revise in the Wet Jeans matter, including documents discussing legal strategies in that case. But those communications, which obviously are confidential, are not relevant to this litigation and therefore do not give Pryor Cashman an advantage that it could now use against its former client.

Nor do I credit the evidence proffered by Revise that it disclosed detailed business information to Pryor Cashman, were that information to be relevant in this case. Even when assured that the record would be maintained under seal, Mr. Sadiqulla was vague about the specific information allegedly conveyed. He referred to discussing the volume of Revise's business, but did not identify it in any detail. (Tr. at 91). He said he gave Pryor Cashman his company's sales figures, but he did not specify those figures. (Tr. at 91). He testified that he discussed Revise's overhead structure, but he did not say what he told Pryor Cashman about the number of Revise employees or the budget for overhead. (Tr. at 91-92). And, when Mr. Sadiqulla stated that he revealed his company's profit margin to counsel, he admitted that it was only the profit margin on the VANILLA STAR line of merchandise at issue in the Wet

30

Jeans litigation.  (Tr. at 92).  Furthermore, the details that Mr. Sadiqulla states that he provided to Pryor Cashman are incongruent with what he suggests was a primary purpose of the discussion in the first place: to convince the law firm that Revise had the capacity to pay its legal bills.  (Tr. at 89).  Finally, if Mr. Sadiqulla had provided Pryor Cashman with confidential information that could be used against Revise, it would have made little sense for Revise to agree that Pryor Cashman could represent Joe's Jeans for purposes even of negotiating a settlement.

Mr. Troy's testimony is similarly open to doubt.  Although he testified at the hearing that he had a telephone discussion with Ms. Kaplan on November 14, 2007 that went into the details of Revise's business (Tr. at 174-77), he failed to mention this at all in the declaration he submitted in support of the motion to disqualify.  There, he stated only that "[o]n or about November 14, 2007, I turned over all of my pre-litigation files concerning the Wet Jeans matter to Pryor Cashman, and subsequently had no further communication or involvement with Pryor Cashman or Revise concerning the Wet Jeans Matter."  (Troy Decl., ¶ 2).  This narrower description of the November 14 discussion is consistent with Ms. Kaplan's testimony, in which she stated that she and Mr. Troy discussed only the history of the communications in the Wet Jeans case.  (Tr. at 219-21).  It is also more consistent with the e-mail that Mr. Troy himself sent to Ms. Kaplan following their

conversation. In that e-mail, he referred only to his communications with the attorneys for Wet Jeans. (Pl. Exh. 7).

Thus, with neither the benefit of a presumption that Pryor Cashman had access to confidential information nor proof that such information was actually communicated, Revise's motion for disqualification must be rejected.

Conclusion

For the reasons discussed above, the motion by Joe's Jeans to strike the reply affidavit of Mr. Sadiqulla is denied, but its alternative application that I consider its surreply is granted. Revise's motion to disqualify the firm of Pryor Cashman as counsel for Joe's Jeans is denied.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       January 13, 2010

Copies mailed this date:

Gordon E. R. Troy, Esq.
Law Office of Gordon E. R. Troy, PC
3333 Lake Road
P.O. Box 368
Charlotte, VT 05445

Daniel A. Ball, Esq.
Ball Law Offices, P.C.
540 Edson Lane, Suite 315
Rockville, MD 20852

32

Lisa M. Buckley, Esq.
Steven M. Rabinowitz, Esq.
Bryan T. Mohler, Esq.
Pryor Cashman LLP
7 Times Square
New York, New York 10036